**STATE of Missouri, Respondent,**

v.

**Steven Ray SALKIL, Appellant.**

**No. WD 33882.**

Missouri Court of Appeals,
Western District.

Oct. 4, 1983.

David F. Williams, Springfield, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P.J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The defendant Salkil was convicted of the felonious restraint [§ 565.120] and rape [§ 566.030] of AS, a young woman of seventeen years and was sentenced to consecutive terms of two and five years imprisonment. AS left home with her girl friend, Lori, after an argument with her husband. They traveled from Sedalia to Springfield, spent the night, and then decided to return home to Sedalia after AS reconciled with her husband by telephone. They decided to hitchhike the journey and commenced the highway vigil at about 11:00 p.m. in the rain. After some twenty minutes, the defendant Salkil came by in a Toyota pickup truck and gave them a ride. They informed him they were bound for Sedalia. The three were so placed that Salkil was behind the wheel, AS was straddled in the middle and Lori occupied the other seat.

They proceeded toward Sedalia. Salkil asked if they wanted a beer, and AS accepted one. It became evident by the erratic movement of the vehicle onto the other side of the highway that Salkil was already influenced by drink. Lori asked Salkil to teach her to drive the vehicle, so he brought the truck to a stop, he moved over, and Lori took the wheel. Salkil then began to make advances to AS. He fondled her leg and after she spurned that, he attempted to run his hand under her blouse. She said "no," and to his question: "Why not?" to discourage further advances, she dissimulated that she was without sexual experience. He ordered Lori to stop the truck, and, angrily, took over the operation once again and refused to speak to them.

As they neared Sedalia, AS asked Salkil to allow them a bathroom facility, but he refused. As they drove through Sedalia, AS directed Salkil to where she lived, asked him to let them out, but he refused. He drove through the city and would not listen to their repeated entreaties to stop and be let out. He told them to "shut up." He sped up the truck in response to the threat by AS to jump out. They begged him to let them out, but his response was: "I brought you all the way up here and I'm going to get something for it."

The girls were upset; Lori was hysterical. He told her to shut up and ordered both to remove their clothing. They hesitated and refused, and he repeated the direction, and sped up. They complied except for the undergarments. He ordered them to: "Take all of it off." Salkil drove onto a gravel road where there was a house nearby

with lights on. By the time the vehicle stopped, however, the lights at the house were out. Salkil then ordered Lori to get down on the floor and AS was directed to lie across the seat. AS told Salkil she needed to void and he allowed her to leave, but to come right back. She went around the pickup, squatted, and she assessed the chance to escape to the house, but she was frightened of the consequences if caught. Salkil came out of the truck and ordered her back in; she refused and he got her by the arm and compelled her. He ordered her to lie across the seat, and she complied. His genital organ penetrated hers. AS testified that the act was painful and that it was accomplished without her consent. Salkil then ordered the women to change places. Two more times AS asked to leave the truck on the pretense of the need of a bathroom. The first time, she assessed once again the chance to run to the house before he could capture her, but returned to the truck. The next time, five minutes later, she decided she "couldn't take it any more," and ran off to the house. She pounded on the front door and shouted to be let in. It was then 4 a.m. The residents testified they heard a woman scream for help, opened the door and found AS there, nude. They clothed her and notified the Sheriff. AS was taken to a hospital for examination. The witnesses testified that when they saw AS at the door she was shaking, in a depressed mood, and had been crying.

The physician who examined AS testified she had visible injuries to her neck and marks on her back. He found no external trauma to the cervix and concluded there could have been entry and intercourse without ejaculation. Forensic serologist Grant testified he could not tell whether or not intercourse had occurred.

Lori gave no evidence.

The defendant Salkil testified that he had consumed two beers that evening, and was simply "riding around" after a stint of trick or treat with his four children that Halloween night. He picked up the two girls about midnight; they told him they were bound for Sedalia and he told them he

would take them. He testified that the girls offered to pay him for the trip, and when he declined, they offered their sexual favors and disrobed. He refused that as well. He turned onto the country road outside Sedalia to allow AS to relieve herself, and when she did not return after a while, he started back to Springfield as requested by Lori. He explained that AS told him she was in the throes of a domestic problem, and her offer of sexual favor was the means to retaliate against her husband.

The defendant contends, first, that there was no evidence of rape or of the forcible compulsion component. He argues that the testimony of the prosecutrix AS was so contradictory and incredible as to require corroboration. He argues that her evidence is so fraught with discrepancy as to vitiate its value as substantial proof. We do not agree that the narrative of a rape of first the prosecutrix, and then her 5′ 9″ companion Lori, within the cramped confines of a Toyota pickup with bucket seats, was contrary to physical possibility. The physical injury to the person of AS, rather, confirms her testimony of a rape in cramped space. The defendant sees other "implausible facts": (1) that throughout the entire trip to Sedalia, the vehicle neither stopped, slowed, etc. to allow AS to escape if that was her design; (2) that her trial testimony—that Lori took over as driver a distance from Sedalia—conflicted with her preliminary hearing testimony that the event took place near Sedalia [with the effect, presumably, to show that AS could have escaped earlier had she made the attempt; (3) that her testimony that the lights were on at the house [to which she escaped] at 3:00 a.m. contradicted the residents who testified they went to bed at 9:00 that night; (4) that the physician could find no trauma to the vagina nor any secretions to corroborate rape or sexual intercourse; (5) that the forensic serologist found no evidence of rape or even consensual intercourse.

■ There was nothing inherently implausible about the practice of restraint by AS to make escape until the time when success was more nearly assured than mere-

ly an attempt from a vehicle in movement. Nor does the misrecollection that Lori took over as driver near Sedalia rather than near Warsaw bear upon any material facet of the proof. As for the house lights, the residents testified that they could have been on during that early morning, as AS testified, because of the needs of their small baby. That the physician could find no evidence of trauma or secretions does not invalidate a rape conviction. Penetration, not ejaculation, is the proof of rape. *State v. Mazzeri,* 578 S.W.2d 355, 356[3, 4] (Mo. App.1979). Nor does the testimony of the prosecutrix that the sexual dalliance by the defendant first with her, then with Lori, then again with her and the other repeated over sixty-five minutes describe a feat not to be believed. Nor does it undermine the probative effect of her testimony that at the trial the prosecutrix testified that Salkil perpetrated three separate rapes upon the women, whereas she had counted five instances at the preliminary hearing. The defendant cites these evidential vagaries to invoke the rule that uncorroborated testimony of a rape victim may not stand where it is so inherently contradictory or unbelievable as to cloud the mind of the court with doubt. *State v. Ginnery,* 617 S.W.2d 115, 117[3] (Mo.App.1981). That principle does not appertain, however, where the inconsistency or even contradiction bears on a proof not essential to the case. *State v. Johnson,* 595 S.W.2d 774, 776[3, 4] (Mo.App. 1980). The testimony of the prosecutrix was without internal variance on any essential aspect of the proof of rape. The occasional lapse of fact does not undermine the probity of that proof. That the evidence of the defendant disagreed with her narrative, of course, is beside the point.

■ The defendant argues also that there was no substantial evidence of forcible compulsion to submit to rape. He seems to argue that since he flourished neither weapon nor shook a fist, there was no proof of want of consent. The prosecutrix testified she submitted to his demand from fear of physical injury. Such a compliance is nonconsensual. *State v. Greer,* 616 S.W.2d 82, 83[1–3] (Mo.App.1981). The

evidence was Salkil compelled her return to the truck interior by manual force and was vigilant against any escape on those several occasions when she left the vehicle for personal relief. The application of force was corroborated by medical evidence of injury to the neck and back. There was, in any event, no requirement of an "utmost resistance" in the face of the threatened violence. *State v. Berry,* 593 S.W.2d 254, 255[1–4] (Mo.App.1980). *State v. Phillips,* 585 S.W.2d 517 (Mo.App.1979), cited by the defendant to sustain the contention of consent. In that case, however, the testimony of the prosecutrix on the essential aspect of penetration was vague and uncertain; also she voluntarily aroused him to the sexual act [presumably by manipulations] when his ardor momentarily failed. The evidence before us, to the contrary, was of refusal and protest and escape and outcry.

■ At the trial the defendant attempted to elicit from the prosecutrix, and offered to prove, that on two prior occasions she resorted to extramarital relations after argument and separation from the husband. The defendant contends the evidence was admissible on the issue of consent: that days before the rape charged against him, the affair, as twice before, was prompted by the domestic venal act. The defendant contended to the court that the evidence was admissible as a defined exception to the rape shield law [§ 491.015]:

> In prosecutions for the crimes of rape, attempt to commit rape ... evidence ... of the complaining witness' prior sexual conduct ... is inadmissible, except where such specific instances are:

> . . . .

> (3) Evidence of immediate surrounding circumstances of the alleged crime . . . .

The legislative intention of that exception, however, is to protect a defendant from false claim of rape by prostitutes, among kindred others, and from a false charge of rape by a prosecutrix who consensually participated with the defendant. *State v. McFarland,* 604 S.W.2d 613, 616

**334** ■ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

(Mo.App.1980); Amburg and Rechtin, *Rape Evidence Reform in Missouri: A Remedy for the Adverse Impact of Evidentiary Rules on Rape Victims*, 22 St. Louis U.L.J. 367 (1978). The evidence was not admissible on the formal ground also that the defendant neglected compliance with the condition of § 491.015(3) that a proposal of such evidence must be by written motion as well as by offer of proof—for determination in camera. The refusal of the evidence by the court was on that ground and was valid.

■ The defendant contends that the charge of felonious restraint was not proved. A person commits the crime of felonious restraint under § 565.120 if the accused:

1. knowingly restrains another
2. unlawfully and
3. without the victims consent
4. substantially interferes with his liberty and
5. exposes him to a substantial risk of serious physical injury.

The defendant contends there was no evidence that he exposed the prosecutrix to a "substantial risk of serious physical injury." MAI–CR2d 33.01 defines "serious physical injury" to mean: "physical injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss of impairment of the functions of any bodily member or organ." The *Comments* to § 565.120 in The New Missouri Criminal Code: A Manual for Court Related Personnel (1978) explain:

> The elements of *felonious restraint* are the same as those of false imprisonment ... with the addition of a substantial risk of serious physical harm to the victim. For example, locking a person in a closet may be false imprisonment. *However, if the circumstances entail a risk of suffocation, the act is felonious restraint.* [emphasis added]

The evidence was that Salkil drove through Sedalia at a high rate of speed and for twenty minutes or so refused to stop the vehicle, drove through stop signals, he refused their entreaties to let them out, and when the prosecutrix threatened to jump out, the defendant accelerated. These actions: the drive at a high rate of speed through a city for a sustained time, heedless of traffic signals, engendered a risk of collision and serious physical injury, and the speed-up antic when the prosecutrix threatened to jump only enhanced the already serious peril of injury which that escape maneuver entailed. The elements of Sec. 565.120 were proven.

The judgment is affirmed.

All concur.