**STATE of Missouri, Respondent,**

v.

**Royce L. WILSON, Appellant.**

**No. WD 39583.**

Missouri Court of Appeals,
Western District.

July 12, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 30, 1988.

Application to Transfer Denied
Oct. 18, 1988.

Robert G. Duncan, Kansas City, for appellant.

William L. Webster, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SHANGLER, P.J., and LOWENSTEIN and GAITAN, JJ.

LOWENSTEIN, Judge.

The defendant, Royce Wilson, was charged with one count of sexual assault in

the second degree, § 566.050, RSMo 1986, and with one count of deviate sexual assault in the second degree, § 566.080, RSMo 1986. He appeals from a verdict and judgment on the deviate sexual assault count.

Sexual assault in the second degree occurs when a person seventeen years old or more has sexual intercourse with another person to whom he is not married who is sixteen years old. Deviate sexual assault in the second degree occurs when a person seventeen years old or more has deviate sexual intercourse with another person to whom he is not married who is sixteen years old. "Deviate sexual intercourse" means any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person. Section 566.-010.1(2), RSMo 1986.

A jury found Wilson guilty of deviate sexual assault by placing his mouth on the vagina of the victim, his niece, and assessed punishment at nine months in the county jail. As to the sexual assault, which was alleged to have occurred the same night, the jury was unable to reach a verdict, a mistrial was declared, and it is not involved in this appeal.

The defendant, a veteran police officer with the Gladstone Public Safety Department, was originally charged with having committed the offense between December 1, 1984, and January 31, 1985. The first trial on these charges resulted in a hung jury. Immediately before this, the second trial, the dates in the information were changed, over the defendant's objection, to January 1, 1985 and April 30, 1985.

The defendant Wilson's niece, L.P., first made allegations concerning Wilson to her boyfriend after the boyfriend inquired about L.P.'s "nervous" and "agitated" behavior he noticed during a family gathering at the Wilson home shortly before Christmas in 1985. The boyfriend also testified that he observed abnormal staring directed at L.P. by Wilson. Two or three days later, L.P. told the boyfriend that Wilson had forced her to have sexual intercourse, and the boyfriend encouraged her to go to the police or her parents to resolve the situation. As it turned out, the boyfriend was responsible for bringing the allegations to the attention of the police. In April, 1986, L.P. called the police to intervene in a squabble with the drunken boyfriend at her home, and he made statements to the police at that time. His testimony concerning L.P.'s allegations was that she had been abused by Wilson since she was eleven or twelve years old, that the abuse included intercourse and an incident involving the videotaping of L.P. wearing lingerie, and that the last time was on January 1, 1985, after a New Year's Eve party. The police officer to whom these statements were made testified that L.P. "burst out in tears, crying very heavily" when asked about the allegations. According to the officer, L.P. was hysterical, and told him that the sex occurred at Wilson's house while she was babysitting, that she and Wilson had been doing it since she was twelve, that videotaping of sex acts had occurred, that intercourse had occurred numerous times, that one instance of abuse occurred on January 1, 1985, and that Wilson would fix her a drink before feeling and touching her and having intercourse.

The Gladstone police officer assigned to investigate the allegations was William Adamo. Adamo first spoke with L.P. at her home. He testified she was afraid, nervous, and extremely upset during the interviews. According to Adamo's testimony, with his recollection refreshed by reference to reports he made at the time, L.P. related that she had started babysitting for the Wilsons in the summer of her thirteenth year and that a pattern of sexual contacts began then. During that first summer, L.P. told Adamo that Wilson had met her in the basement and touched her buttocks through her swimming suit. L.P. told of the fall of 1984, when she babysat and stayed the night, with Wilson coming downstairs, giving her a beer, touching her all over, and going back upstairs. Another incident involved Wilson showing L.P. "dirty movies," asking her to do the things depicted, and L.P. refusing, with Wilson again touching her all over. Adamo testified to L.P.'s allegations concerning events on January 1, 1985 after a New Year's Eve

party. Wilson was stated to have given her two drinks, to have tried to undress her, and to have had sexual intercourse with her in spite of her resistance. Interviewing L.P. a second time on a subsequent day, Adamo was told of other incidents, including one when Wilson awakened L.P., who was sleeping with Wilson's daughter, and had her come downstairs only to touch her. Also related was an incident when Wilson had L.P. put on his wife's bikini and photographed her with the top on and off. Adamo also testified to confronting L.P. with Wilson's apparently confirmed alibi as to the January 1, 1985 time period. At that point, three days after the first interview, L.P. pinpointed the time to an occasion when Wilson and his wife went out with a friend in a "computerized" car. At this time, L.P., for the first time, mentioned that the episode involved Wilson performing an act of oral sex on her.

Captain Adamo then questioned his fellow officer. His testimony is as follows:

"After the waiver was signed, I advised Officer Wilson that there was a young lady who had made a complaint against him for some type of sexual misconduct. And he expressed a feeling of relief, and he indicated to me that he was concerned it was something serious, like he had shot someone, and this was not a big deal."

Wilson then told Adamo that he had, "never under any circumstances had sexual intercourse" with L.P., or photographed her, and that he was never at any time alone in the house with her. He did acknowledge giving her a few drinks of alcoholic beverages. Wilson also told Adamo that L.P. had told him she had a drinking problem, and that when Wilson was a traffic officer, he would stop L.P. to determine whether she was driving under the influence. At the time of Adamo's interview of Wilson, Wilson stated that but for one exception, L.P. had not been in his home for about two years.

During her testimony, as to the charge appealed from, L.P. testified to a Christmas season dinner and the eventual squabble when the allegations against Wilson were initially made. She testified that she did not tell her parents about Wilson's action because she was afraid. When asked when Wilson had last had sexual intercourse with her, she stated it was between January and April of 1985—after Christmas and before she went on a family vacation in May. As to her allegation that the episode occurred after a New Year's Eve party, she stated that she was confused, but that she remembered they were all dressed up. Her recollection was that the Wilsons had been out with a friend, Dee Spencer, and that Wilson's wife went to bed shortly after they got home. Royce Wilson came back downstairs, watched television, and then went to the bathroom. Upon returning, he took a blanket off L.P., raised her shirt and touched her breasts. He then put his hand down her shorts and placed a finger in her vagina, and followed this by pulling down her shorts and licking her vagina. The accused act of sexual intercourse immediately followed. According to L.P.'s testimony, when Wilson was done, she went to the bathroom, and when she came out he was gone. L.P. stated Wilson did not have her consent for either act. She also related that Wilson told her that her Aunt Brenda (Wilson's wife) would hate her if she revealed his actions.

On cross-examination, L.P. remembered telling the police officers she had had sexual intercourse with Wilson since she was twelve and asserted that it was true. She recalled telling the police of the New Year's incident, of the early incident involving Wilson touching her through her swimsuit, and of the incident when she was sleeping with Wilson's daughter. She did not recall telling the police about the incident involving the dirty movie or that she had started babysitting the summer she was thirteen. She did not recall telling her boyfriend that she had been "doing it" with Wilson since she was eleven or twelve and asserted she told the boyfriend there was only one time videos were made. As regards Adamo's investigation, L.P. remembered being confronted with questions about the January 1, 1985 incident. She reiterated her confusion as to dates, and acknowledged consulting her mother to pin

down the date when the computerized car was involved. L.P. admitted signing a statement to that effect, and that she was sure that was the time.

L.P. faced a number of questions on cross-examination regarding inconsistencies between her testimony at the first trial, which ended in a hung jury, and the trial that is the subject of this appeal. Primarily the questions involved whom she told about the events and the dates she had said various events occurred. She denied the allegations were a lie and that was the reason she had not wanted to tell her parents. L.P. asserted she babysat for the Wilsons four times after her sixteenth birthday, when she got a car and started working. The Wilsons had stopped using her for daytime child care shortly before her sixteenth birthday. She stated she was paid by check most of time.

On redirect, L.P. testified, without objection, about various prior allegations of sexual activity between her and Wilson. The testimony, for the most part, restated Adamo's testimony, but did set the time of the other incident which supposedly culminated in sexual intercourse as being in the summer of 1984. L.P. testified that sexual *contact* had begun when she was twelve or thirteen. She acknowledged telling Adamo she had not revealed this secret earlier because Wilson was part of her family, because everyone would be mad at her, and because she was scared for somebody to know or think it was her fault. She stated that she did not tell her boyfriend about the act of oral sex because she was embarrassed. Finally, L.P. testified that she kept babysitting for the Wilsons after some of the events because her mother made her; that she claimed to her mother that she could not handle the children as a way of getting out of it, but her mother still expected her to go.

The defendant's wife of seventeen years testified that L.P. was 12 when she began babysitting for them. She testified there was a two-month period when L.P. provided daily daytime services, but they terminated her when problems arose in July of 1984, and she never provided care again.

Mrs. Wilson testified they had not required a sitter on New Year's Eve for several years. She also testified that the event involving the computerized car was Mr. Wilson's birthday in March, 1983, and that L.P. had, in fact, babysat that night. Her testimony was that L.P. and a girlfriend had been taken home in the computerized car by the gentleman with the car, along with Wilson, when the Wilsons returned from their evening out. Mrs. Wilson testified that L.P. would sometimes stay the night when providing child care. Mrs. Wilson stated she never saw anything "out of line" between her husband and L.P.

Wilson's daughter testified that L.P. never told her anything was happening and that she never saw anything. She stated that she started babysitting after L.P. was terminated, and that L.P. did not babysit again because she was not needed. She testified that when L.P. was babysitting, L.P. would have boys over and have her watch out for Mrs. Wilson.

A family friend of the Wilsons confirmed that the Wilsons had been in her home New Year's Eve in 1984 and 1985.

A series of witnesses for the defense were used to try to establish that the evening involving the computerized car linked by L.P. to the charged activities occurred in March, 1983. The Wilson's family friend, Dee Spencer, testified that he borrowed a computerized Lincoln from his then employer in March, 1983, and that on no other occasion did he have such a car. His testimony was that he and Wilson drove L.P. and her girlfriend home at the end of the evening. Spencer's recollection as to the date he borrowed the car was confirmed by his ex-employer.

The defendant Royce Wilson testified he had been a police officer for seventeen years, two of which he had been a detective. He denied molesting L.P., having intercourse with her, or putting his mouth to her genital area. He acknowledged L.P.'s services as a babysitter for his children. Wilson stated he paid her by check, and produced what he asserted were all the checks issued to her. The last check was from August 3, 1984. He testified that

was the last date L.P. ever babysat for him, and that he stopped using her because of problems that arose. Wilson testified concerning the computerized car and produced a check dated March 5, 1983 to L.P., paying her for that evening's babysitting.

Cross-examination of Wilson focused on discrepancies between his statements included in the reports of Officer Adamo regarding his work schedule and records of his work schedule provided by his employer, as well as discrepancies as to when L.P. started babysitting and the last time she had been in the Wilson home.

Rebuttal testimony included that of L.P.'s mother. She testified that she personally had babysat for the Wilson children after August, 1984, after which, according to the defendant's evidence, no one but his daughter and mother had provided care. She also testified that L.P. had provided care after August, 1984. L.P.'s mother confirmed that L.P. had objected to going to the Wilsons, but that she and her husband had "forced her" to go. The final witness was a Gladstone police officer who testified that he considered himself a friend of Royce Wilson, and that he had borrowed two pornographic movies from Wilson to be shown at a party.

This appeal does not involve the multitude of evidence which would constitute "other crimes". In fact, all of this evidence was used by Wilson to show the changes in the victim's previous accounts. The defendant's cross-examination showed changes in her story as to when things occurred after having been told they could not have happened on the dates she offered, and changes in her accounts as to what sexual acts took place.

## I

As part of his first point, Wilson questions the sufficiency of the evidence. As an adjunct to this point, he states the testimony of L.P. was inconsistent and contradictory, and not being corroborated, left the state with no evidence. Review is to determine if there was substantial evidence, that if believed by the jury, would sustain a guilty verdict. To that end, all

substantial evidence implicating the defendant is assumed as true and every legitimate inference reasonably drawn from the testimony is to be indulged. *State v. Pizzella*, 723 S.W.2d 384, 391 (Mo. banc 1987). This court will not weigh the evidence nor pass on credibility of witnesses, but will review only to determine if the guilty verdict is supported by substantial evidence. *State v. Harvey*, 641 S.W.2d 792, 799 (Mo.App. 1982). The uncorroborated testimony of the rape victim is sufficient to sustain a conviction, and any uncertainties are for the jury's resolution. Corroboration is not mandated unless the victim's testimony is so contradictory and in conflict with physical facts, surrounding circumstances and common experience, that its validity is thereby rendered doubtful. *State v. Harris*, 620 S.W.2d 349, 353 (Mo. banc 1981).

To reiterate the facts, L.P. testified that on the night in question, she had been babysitting for the Wilson's. They came home at one o'clock in the morning, and after the children and Mrs. Wilson went to bed, the defendant came downstairs, raised L.P.'s shirt, touched her breasts, put his hand down her pants and stuck his finger in her vagina. L.P. testified that Wilson then licked between her legs, her vagina, and then had intercourse with her. Again, her court testimony was that these events took place within the first four months of 1985.

Wilson relies on *State v. Kuzma*, 751 S.W.2d 54 (Mo.App., W.D., 1987) for the contention that L.P.'s testimony was so inconsistent as to have needed corroboration. The state counters by saying the corroboration requirement in rape, sodomy and incest cases doesn't apply to this, a case of deviate sexual assault. The statute on which this case rests, § 566.080, which defines deviate sexual assault in the second degree, is for all intents and purposes the same as for sodomy, § 566.060. The primary difference between the statutes, as pertinent here, is that § 566.080 relates to the age of the perpetrator and the victim, but it is for the same act as the sodomy section. The court rules, therefore, that the corroboration requirement is necessary

in a § 566.080 case where the testimony of the victim is so contradictory or in such a conflict as described by *State v. Harris, supra.* This ruling does not save the day for Wilson. The court rules the inconsistencies of L.P.'s testimony bear "on a proof not essential to the case." *State v. Salkil,* 659 S.W.2d 330, 333 (Mo.App.1983). The testimony of L.P., as in *Salkil,* was without internal variance on any essential aspect of the sexual assault. Her lapses as to previous accounts of sexual misconduct or as to the exact date of the event did not undermine the probity of her proof on the charge in question. *Id.* at 333.

It is not every inconsistent statement that makes the corroboration rule applicable. *State v. Ellis,* 710 S.W.2d 378, 381 (Mo.App.1986). Against the backdrop of the family relationship between L.P. and Wilson and based on the entire record here, the inconsistencies went only as to L.P.'s credibility and were a jury issue. *State v. Harris,* 620 S.W.2d at 354. L.P.'s problem as to prior dates and acts did not render her testimony insufficient. *State v. Hamrick,* 714 S.W.2d 566, 568 (Mo.App.1986). At any rate, time was not of the essence in this case. *Id.*

The point is denied.

## II

■ Wilson next alleges error because the verdict director "did not require the jury to find the acts of the appellant were a sexual act," or in other words, the use of his mouth on the victim's vagina did not constitute a sexual act.

This point lacks any merit. As noted earlier, § 566.010.1(2) defines deviate sexual intercourse as involving the genitals of one person and the mouth, tongue, hand or anus of another person. As is pertinent here, Instruction number 8 reads as follows:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or between January 1, 1985 and April 30, 1985 in the County of Clay, State of Missouri, the defendant placed his mouth on [L.P.'s] vagina, and

Second, that defendant was then seventeen years old or older, and

Third, that [L.P.] was then sixteen years old, and

Fourth, that defendant was not then married to [L.P.].

then you will find the defendant guilty under Count I of deviate sexual assault in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

This instruction tracks the language of MAI–CR3d 320.12, which reads:

"(As to Count ___, if) (If) you find and believe from the evidence beyond a reasonable doubt:

First, that (on) (on or about) (at about [*time of day or night*] on) (between the hours of [*times of day or night*] on) [*date*], in the (City) (County) of _____, State of Missouri, the defendant [*Describe acts constituting deviate sexual intercourse.*], and

Second, that defendant was then seventeen years old or older, and

Third, that [*name of victim*] was then sixteen years old, and

(Fourth, that defendant was not then married to [*name of victim*], and)

\*     \*     \*     \*     \*     \*

then you will find the defendant guilty (under Count ___) of deviate sexual assault in the second degree...."

It is hard to imagine what more could have been done to properly instruct the jury other than Instruction number 8, which follows the approved instruction, which in turn follows the statutes. *State v. McIntyre,* 735 S.W.2d 111, 113 (Mo.App. 1987).

The point is denied.

## III

■ The next point concerns the denial of Wilson's attempt to introduce in evi-

dence a tape of a March, 1983 telephone conversation.

The court refused Wilson's offer to introduce a tape recording made from his home phone. The tape purportedly contained a conversation between Wilson and his father, L.P.'s call to her brother to tell him she was spending the night, L.P.'s girlfriend's call to her parents, and the girls' calls to set up dates.

The trial court's ruling was correct. The 1983 phone conversations were not relevant to the 1985 charge. The victim had been thoroughly questioned as to the dates and had been shown to have been incorrect on her earlier statements. There could have been no question that the dinner with Spencer and the car incident happened in 1983 and not the night in 1985 on which the crime was committed. Wilson cannot clearly show an abuse of the trial judge's discretion on this evidentiary issue, so it is denied. *State v. Brown,* 718 S.W.2d 493, 94 (Mo. banc 1986).

## IV

Wilson's final point, reviewed under plain error, concerns improper prosecutorial closing argument and an incorrect ruling from the court. The following portions of the transcript are pertinent:

(MR. BEDNAR, the prosecutor): The Gladstone police officers weren't there and as I said before there are duties involved. They all came in, and they all testified against this man, another law enforcement officer. Now do you really think that if they thought that [L.P.] should not believed, they would have carried on this investigation.

MR. DUNCAN: Now, Your Honor, I'm going to object to that. That's just—

THE COURT: Objection is overruled. Jury will recall this is closing argument and will remember the evidence. Proceed.

MR. BEDNAR: Police do reports all the time. Investigation is carried through sometimes and sometimes not. This one was carried through.

MR. DUNCAN: Well, Your Honor, may we approach the bench.

(Counsel approached bench):

MR. DUNCAN: The law absolutely requires they do investigating, absolutely.

THE COURT: Objection overruled. Counsel, move on.

Wilson asserts the effect of the argument and ruling was prejudicial as it told the jurors if the police had not believed the victim and felt the defendant guilty, they could not have investigated the case and brought it to trial.

A prosecutor has a right to comment on the evidence and the credibility of witnesses from the state's viewpoint. *State v. Anthony,* 577 S.W.2d 161, 163 (Mo.App. 1979). The prosecutor may not argue for the jury to base a verdict on an "expression of confidence in a prosecutorial system which does not bring innocent persons to trial." *State v. Bramlett,* 647 S.W.2d 820, 822 (Mo.App.1983). The following argument in *Bramlett* was to cause the jury to believe the testimony of an undercover drug agent and for the jury to demonstrate its alliance with these operations.

"How in the world are we going to fight it if you don't even believe your own representative who was sent into the field?

\* \* \* \* \* \*

Every undercover operation we've run has been a success. The prosecutor of this county, like all counties, is under a duty, a duty, a sworn duty, that if he believes in the innocence of the defendant, he has to make that known to the court and to his lawyer.

*Id.* at 822.

An objection to this comment was overruled and declaration of a mistrial denied. This court reversed, calling the argument prejudicially erroneous and the ruling incorrect in a case where credibility was the sole issue.

Not all arguments about police activity and testimony cause a reversal. In *State v. Cage,* 452 S.W.2d 125, 130 (Mo.1970), where two policemen had testified to seeing the drugs in the defendant's hands, the argument was either the defendant "is guilty of possession of a stimulant drug or

they are guilty of perjury." The *Cage* opinion stated that the remark was not "prejudicially improper", but any detrimental effect was removed when the court administered a rebuke to the prosecutor. *Id.* at 130. In *State v. Harp*, 680 S.W.2d 297, 300 (Mo.App.1984), the prosecutor said, "it was incumbent upon the jurors to vindicate the police officers who had testified." This argument did not mandate a mistrial. The court said that use of the term "vindicate" was "not beyond criticism," and the argument was permissible. *Id.* at 300. Similarly, the argument, "[t]he defendant would have you believe the police are liars," where an objection was overruled, did not amount to reversible error in *State v. Harrelson*, 636 S.W.2d 83, 86 (Mo. App.1982). In *State v. Bryant*, 741 S.W.2d 797, 799 (Mo.App.1987), the prosecutor argued, over objection, that the two officers, "would not lie because they would not do that to themselves, the people of Florissant, or the victim." This argument was held to be within permitted boundaries. *Id.*

■ In the case at bar, the comments are held to have been wrong, improper, and incorrect. The police testimony merely recounted what the victim, the defendant, and other witnesses told investigators. Other than the brief rebuttal witness for the state, a police officer who borrowed a pornographic movie from Wilson, there was no police testimony "against" the defendant. The other clear message from the argument was that the police believed the victim. This argument was improper. *State v. Bramlett, supra*, at 822. The ruling of the court was incorrect and made the situation worse. *State v. Williams*, 646 S.W.2d 107, 110 (Mo. banc 1983). Balanced against this error is that under the instructions, MAI–CR3d 302.04 and 302.06, the jury was instructed not to view the arguments as evidence and not to take the fact that a person has been charged as evidence of guilt. Under the scope of review, the argument cannot be said to have resulted in a manifest injustice or a miscarriage of justice. Rule 30.20. An alleged error in closing argument does not justify relief under plain error unless determined to have had a decisive effect on the jury.

*State v. Murphy*, 592 S.W.2d 727, 732 (Mo. banc 1979). It cannot be determined that the argument had a decisive effect on the jury, and this court is constrained to decry the prosecutor's argument, and to express a hope such comment and inferences will have no place in criminal trials in our state.

Judgment and sentence affirmed.

All concur.