STATE of Missouri, Plaintiff-Respondent,

v.

Ronald PHILLIPS, Defendant-Appellant.

No. 11011.

Missouri Court of Appeals, Southern District, Division One.

July 16, 1979.

Motion for Rehearing or to Transfer to Supreme Court Denied Aug. 6, 1979.

the sexual organ of Nola Elmore, or b) threatened Nola with physical violence causing her to submit to sexual intercourse by reason of fear for her safety if she did not do so, and 2) that the court erred in submitting Instruction No. 4 (verdict director) for the reason that there was no evidence from which the jury could find that defendant had sexual intercourse with Nola Elmore or, if so, that she submitted to such by reason of threats made by defendant causing her to fear physical violence to herself if she did not submit. Since both of defendant's complaints are bottomed on the claim of insufficient evidence, we review the evidence in the light most favorable to the state, accept all substantial evidence and all legitimate inferences fairly drawn therefrom, which tend to support the verdict, and reject all contrary or contradictory evidence. *State v. Petrechko*, 486 S.W.2d 217, 218 (Mo.1972).

Viewed in a light most favorable to the state, the evidence at trial was as follows. Nola Elmore (prosecutrix) testified that she was a cab driver for the Terminal Cab Company of Carthage, Missouri. On October 31, 1977, at about 10 p. m., she was dispatched to the Fast Trip Super Market to pick up a passenger, the 17 year old defendant. Defendant asked her to take him to the Red Rock Apartments. As prosecutrix was driving along the river road near Kellog Lake, defendant suddenly grabbed the steering wheel. She put her foot on the brake and stopped the car. She thought that defendant was either acting silly or wanted the car. She put the car in park gear.

Somehow the door on the driver's side of the cab came open. She fell out, and defendant slid out after her. Defendant seemed to think it was funny. Defendant wound up partially under the cab while she was hanging on the car door. Her mind was "kind of blank" on what happened next. She then stated defendant took her by the arm and started to lead her to a boat ramp. She tried to reason with him, told him she was old enough to be his mother and if he would let her take him home,

John D. Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

A. L. Shortridge, Joplin, for defendant-appellant.

GREENE, Judge.

Defendant Ronald Phillips was convicted in the Circuit Court of Jasper County of the crime of forcible rape in violation of § 559.-260, RSMo 1969, V.A.M.S. His punishment was fixed at 5 years' imprisonment by the jury. His motion for new trial was overruled. The trial court, after consideration of the pre-sentence report, reduced the sentence to the minimum prescribed by law for the offense in question, which was two years. Defendant appeals the judgment and sentence.

Defendant raises two points on appeal, which are 1) that the trial court erred in overruling defendant's motion for judgment of acquittal made at the close of all of the evidence for the reason that the evidence was legally insufficient to prove that defendant, a) inserted his sexual organ into

nothing would be said. He told her that he knew she was wanting him or needing him, or words to that effect. She said the car would be seen, as the lights were on and the motor was running.

He tried to pull her trousers down but, because she was wearing knee-high boots and socks, as well as pantyhose, her trousers would not come down past her boots. He "tried to do what he wanted to do there, but he couldn't get in position for it right". Defendant "backed off a little ways". She picked up an empty beer can and hit him 2 or 3 times. He "just quit". The couple walked back to the car. She said defendant turned off the lights and the motor. The dispatcher called over the radio and said, "If you can hear me you have a call at Gale's". Defendant grabbed for the radio wires and prosecutrix started running.

Defendant ran after her and caught her, picked her up and carried her to a spot near the river. She "hollered something" like "you are going to fall in the river", and they both fell to the ground. He said, "Take your boots off", showed her his fist and said, "If you don't, I'll throw you in the river". He did not hit her but she was afraid he might. She took her boots off and, even though not asked, took her pants down. She then helped him take them off and "that is when he penetrated. There was times when he was in, and he wasn't in and he thought he was, and then he seemed to lose his erection." He wanted her to fool with him to help him "get it back", so, "I started to help him with it, and about that time I heard Mr. Nichols (her employer) holler my name and I showed him and said, they are coming." She didn't think he had a climax.

On cross-examination, she said she imagined that she had turned the car motor off, as you had to pull the shift over in order to get the key in the right position for off, which contradicted the testimony that she had given on direct-examination. She admitted that she had not told the police about the struggle for the car radio, as she had not remembered it until after she gave a statement to the police. She said he was "stradling" (sic) her when he told her to take her boots off. She said she kept telling him that "he would be caught, we would be caught down there and this and that". She went to the hospital for an examination after the police came. The examination did not reveal any evidence of sexual assault.

On redirect-examination, she said she was frightened when he told her he would throw her in the river if she did not take her boots off, and when asked if that was the reason she took them off said, "partly, yes, it was . . . if he was going to throw me in the river, I can swim, but I don't know if I could with them on or not". She testified, in answer to a question asking if she was frightened, "Yes. Like I said . . . I wasn't so worried about the rape part as I was about what he was going to do afterwards". There was no testimony as to what he was going to do in the future. Defendant never struck her, never threatened to kill her, never threatened to hurt her, and never threatened to do anything to her except throw her in the river if she did not take her boots off.

Burt Nichols, the manager of the cab company, then testified. He said he went to the office of the taxi cab company at about 10:15 p. m. on the evening in question and found that one of the taxi cabs was missing. He drove down by Kellog Lake and saw the cab sitting in the road. Carthage Press newspapers were "strung out" on the driver's side of the front seat. He radioed his dispatcher and told him to call the Carthage Police to the area. Nichols shouted Nola's name, and she called back, "I'm over here". She was in a tall, grassy area some distance to the east. He went to the area where she was. Prosecutrix was sitting on the ground in a "disposed" position, naked from the waist down. He saw defendant running toward the river with his pants down. Defendant then jumped into the river. Nichols fired a shot in the air with his pistol, and defendant stopped swimming and came back to shore. The police came. When Nichols left the scene, defendant was lying on the river bank.

Robert Byrd then testified. He said he was in the Kellog Lake area on the night in question. He got there about 9 p. m. About an hour and a half later, he saw a car stop over at the river and heard a woman yell. He did not know what she said. He later saw the car. It was a cab and it was sitting in the middle of the road. He said the lights of the car had gone out within seconds after it stopped, thereby contradicting the testimony of prosecutrix. The yell that he heard did not sound like a cry for help but sounded like a couple of drunks. He was at the scene when Nichols called for Miss Elmore. All was quiet before he called her. After Nichols called, all that she said was "I'm over here". This concluded the evidence for the state.

Defendant's evidence was as follows. Carthage Police Officer Kenneth W. Thompson was one of the police officers called to the scene. He saw the taxi cab sitting in the middle of the road. The defendant was laying in the water and was either in shock or a coma. He was taken to the jail and then to the hospital. The prosecutrix did not give a statement at the scene, but gave one later at the police station. She was nervous and upset. She did not have any bruises or any other marks on her.

Dr. Gil B. Manalo then testified. He examined the prosecutrix after the incident in question. He did not find any evidence of male sperm. He said that she was nervous, distressed and frightened. He did not find any evidence of bruises. After conclusion of all the evidence, defendant moved for a judgment of acquittal on the grounds that the state had not made a submissible case. The motion was overruled.

██ A conviction for rape may be sustained upon the uncorroborated testimony of the prosecutrix alone, unless her testimony is contradictory and in conflict with physical facts, surrounding circumstances, and common experience so as to be so unconvincing and improbable that it is extremely doubtful, in which case corroboration is required to sustain the verdict. *State v. Lee*, 404 S.W.2d 740, 747 (Mo.1966).

Where the prosecutrix is a mature woman, where the alleged rapist is only one year removed from being classified as a child under Missouri law, and where the case, as here, is extremely weak, corroboration should be required. Neither the state nor defendant have cited any cases in their briefs, and we find none where the words "he penetrated me" have been held to be proof of sexual intercourse, of and by themselves. Even when you add her words "there was times when he was in and he wasn't and thought he was", her testimony on the issue of sexual penetration was vague and conclusionary.

██ Further, on the issue of whether prosecutrix sexually submitted to a 17 year old boy out of fear of violence to her person if she did not do so, the state's case comes a cropper. It is true that actual physical force need not be proven, if the woman who submits to sexual intercourse does so through fear of violence that overpowers her mind to resist. *State v. Garrett*, 494 S.W.2d 336, 339 (Mo.1973); *State v. Hamm*, 577 S.W.2d 936, 939 (Mo.App.1979), but there is no such evidence in this case. A meticulous review of the evidence shows, at the very least, that the testimony of prosecutrix regarding the fear issue is contradictory and in conflict with surrounding circumstances, common experience and common sense. There was no violence done to her person, and the only alleged threat of violence was her testimony that he showed her his fist and said that he would throw her in the river if she did not take her boots off. There was no testimony that he said he would hit her, throw her in the river, or anything else if she did not submit to his sexual advances. She said, "I wasn't so much afraid of the act of rape itself as I was of what he was going to do afterward", but there was no testimony of what he was going to do afterwards. After she took her boots off, there is no testimony that he threatened her in any way, or that she submitted out of fear. She helped him take her pants off and, after he lost his erection, was in the process of voluntarily helping him to "get it back" when her employer

arrived at the scene. There was no evidence that she made a prompt outcry to him, or to the police, that she had been raped. There was no evidence that she was crying or hysterical. There was no medical evidence that she had been sexually abused.

There was absolutely no corroboration by any witness of her testimony alleging rape by force, or fear of force, even if we could consider her testimony as probative on that issue. Witnesses did testify that she was nervous and upset after the incident, but such testimony is not necessarily corroborative of her being raped by force or fear. We are of the opinion that the uncorroborated testimony of the prosecutrix, where some of such testimony was contradictory and much of it contrary to common experience and common sense, was legally insufficient to take the case to the jury on the issue of force and lack of consent. This being so, the trial court should have sustained the motion for a directed verdict of acquittal at the close of all of the evidence on the grounds that the state had not made a submissible case. The failure to do so was prejudicial error.

While we are loath to overturn a jury verdict, as a jury has an opportunity to weigh evidence and determine the credibility of witnesses, we have a duty to do so when the case should never have been submitted to the jury in the first place and where the net result of the jury verdict would result in imprisonment of the defendant on facts as vague, conclusionary and contradictory as these.

The judgment is reversed. The defendant is discharged.

FLANIGAN, C. J., concurs in result and files separate opinion.

TITUS, J., concurs.

FLANIGAN, Chief Judge (concurring in result).

The state's verdict-directing instruction (MAI–CR 6.40) required the jury to find the defendant guilty of rape if they found and believed from the evidence beyond a reasonable doubt:

First, that on or about October 31, 1977 in the county of Jasper, State of Missouri, the defendant inserted his sexual organ into the sexual organ of Nola E. Elmore, and

Second, that he did so against her will and after he caused her to submit by threats which caused her to fear physical violence to herself.

In my opinion the state's evidence was sufficient to support the jury's finding that the defendant inserted his sexual organ into the sexual organ of the prosecutrix.

I concur in the result of the principal opinion for the reason that, in my opinion, the state's evidence was insufficient to support the finding by the jury that "he did so against her will and after he caused her to submit by threats which caused her to fear physical violence to herself."