STATE of Missouri, Respondent,

v.

Bruce R. KUZMA, Appellant.

No. WD 38338.

Missouri Court of Appeals,
Western District.

Nov. 17, 1987.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
Dec. 29, 1987.

Application for Transfer Sustained
Feb. 17, 1988.

Case Retransferred May 18, 1988.

Court of Appeals Opinion Readopted
May 31, 1988.

Kathleen Murphy Markie, Lew A. Kollias, Columbia, for appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for respondent.

Before CLARK, P.J., and NUGENT and LOWENSTEIN, JJ.

NUGENT, Judge.

Defendant Bruce R. Kuzma appeals his convictions by a jury for sodomy and first degree sexual abuse. Among his complaints he claims that his identity as the perpetrator was not established beyond a reasonable doubt. Finding that point dispositive of this appeal, we reverse and order the defendant's discharge for the reasons set forth below.

On May 18, 1985, the marital difficulties between the defendant and his wife of twenty months were aggravated by an overnight visit from her former husband, who had come to spend time with Theresa and David, the natural children of his marriage to Mrs. Kuzma. During the two day visit, he and Mrs. Kuzma took the children on various outings and he spent the night in his son's room. A similar visit had taken place at some earlier time. On May 26, the defendant, distraught over his failing marriage, moved out of the house he shared with Mrs. Kuzma and her two children.

In late May, after the defendant and Mrs. Kuzma had separated, five-year-old Theresa told her grandmother and later her mother about a recent incident of sexual abuse involving the defendant. Around May 31, Mrs. Kuzma took the little girl to the police department to report the incident. In fact, Mrs. Kuzma had to take the child to the police station at least four times before she was able to give "a usable statement." At some point, the police advised Mrs. Kuzma that the child should have a medical examination. Around the 18th of June, she was examined at the emergency room of Children's Mercy Hospital. The only physical problem that came to light was redness on her legs, evidently on her inner thighs.

At the time of trial on March 17, 1986, the little girl was six years old. After she was sworn to testify, the defendant objected to her competence, incorporating by reference the arguments set forth in his motion to challenge the competence of witnesses, but the trial court overruled the objection. Theresa testified that at an earlier unspecified date,[1] when defendant had been babysitting her, he gave her a spanking after she disobeyed him and rode her bicycle. She stated that the defendant also removed her clothes, "stuck his finger in" her "bottom" and stuck one finger in her "potty" place in the front of her body. He then threatened to spank her if she told anybody, but she immediately told her brother David about the incident. In response to the prosecutor's questions she affirmed that defendant had done something "like this" when she lived in Bonner Springs, Kansas.

During cross-examination, the child admitted that she once told her mother and her grandmother that her natural father had molested her, not the defendant. She also stated that she called both men "Daddy" and sometimes referred to the defendant as "Daddy Bruce." Defense counsel, apparently referring to statements she made in a deposition ten days earlier, reminded Theresa that at that time she had forgotten what parts of her body the defendant had touched and she acknowledged that she had forgotten. When asked if she knew now what she had forgotten, she first

_____
1. The state alleged that the offenses occurred on or about May 15, 1985.

said, "Now I do," but later said, "No." Then, she stated that the incident had taken place in Bonner Springs where the defendant and her family used to live. She explained that she thought the defendant had committed the acts at two different times, in contrast with her testimony on direct examination that the incident had occurred only once when she lived on 56th Street.

At that point, defense counsel began to question the child about whether she knew the difference between telling the truth and telling a lie, again reminding her of what she had said in her deposition. She acknowledged that telling a lie was "some English" and "bad moon shine" as opposed to "good moon shine." However, she could not remember what kinds of things happen if she told the truth or what things happen if she told a lie. She agreed that she needed help from members of her family to remember everything that happened because by herself she did not remember.

On redirect examination, she affirmed that the defendant was the only one who had ever done "anything like this" to her.

Her brother, eight-year-old David, testified generally about the defendant's relationship to him as a step-father and that his sister had discussed an incident involving the defendant with him. He acknowledged that he also called both the defendant and his natural father "Daddy." When he later testified in rebuttal, the prosecutor reminded David that the oath he had taken earlier requiring him to tell the truth was still in force. When asked if he understood that, David said, "Yes." However, ten days before trial, he had stated in his deposition that he might tell a lie in return for three scoops of ice cream.

David testified that when he was about five years old, defendant had anally sodomized him, but on cross-examination he changed his story. He said that after they had showered and when he was fully clothed and the defendant was shaving while dressed in his underwear, the defendant had accidentally bumped against David's backside. On redirect examination, the boy stated that the defendant, clad in

his underwear, merely brushed against him. However, he later indicated that he once felt the defendant's penis inside his bottom "on accident" when the family lived at a previous address. As it had with Theresa, the court permitted David to testify without first determining the boy's competence as a witness.

Mrs. Kuzma gave the following testimony bearing on the issue of the identity of the perpetrator. She admitted that on more than one occasion she had suspected her former husband of sexually abusing Theresa and had also suspected her own brother, particularly one time when the children visited him for about six weeks. Mrs. Kuzma stated, however, that during her former husband's overnight visit with his children in May, 1985, he was never alone with Theresa.

On cross-examination, Mrs. Kuzma admitted that she spoke with the defendant by telephone a number of times after May 15, and that she said at various times words to the effect that if the defendant "thought he'd already been destroyed, just wait, things were going to get worse." She also agreed that she had told the defendant in a number of conversations that "this particular situation" never would have arisen if he had not left home. Defense counsel asked Mrs. Kuzma if she recalled talking with the defendant and Theresa on the front porch of their house around June 2, 1985, when the child specifically stated that her real father, not the defendant, had recently molested her. Mrs. Kuzma agreed that Theresa might have made such a statement but did not recall her having done so.

Defendant testified in his own behalf. He denied ever having inserted his hands, fingers or any part of his body into Theresa's vaginal area, or ever having touched her in a sexual manner. However, he acknowledged that in May, 1985, he was alone with her for about two hours every afternoon, from the time she returned from child care in the mornings until her mother came home from work after 3:30 p.m.

He stated that he left the family home on May 26, 1986. The record suggests that Theresa had already told her grandmother

and her mother about the sexual abuse at that time and that the defendant was aware that Mrs. Kuzma had sought his arrest. The defendant first went to Sacred Heart Church, then headed by car for the Clay County Jail "to turn himself in." A Claycomo police officer observed him driving erratically and stopped him to see if he was intoxicated. The defendant testified that he was hysterical at the time because Detective Howard Taylor[2] had told him that if he were not going to take a polygraph test, he might as well plead guilty to the charges of sexual abuse and accept a plea bargain. Believing that he could not defend himself against the sexual abuse charges, the defendant decided to commit suicide in his car. He said that he had a knife in his hand aimed at his chest and was about to stab himself when the officer pulled him over. Defendant told the officer that nobody would believe him because he was "going up against two kids,"[3] and later commented, "I don't deserve to live in this cruel world." The defendant was taken by ambulance to Tri–County Community Health Center where he voluntarily committed himself and stayed for two weeks.

Sergeant Joseph Gorman told a different story. He testified that he came in contact with the defendant when he responded to a call for assistance from one of his men. The defendant did not appear to be drunk but was highly distressed and crying. According to Sergeant Gorman, the defendant continuously aimed a folding knife at his lower genital area and was saying that he "was gonna cut his dick off and that he didn't deserve to live." The defendant's pants were unbuttoned and partially unzipped but no part of his body was exposed. When Sergeant Gorman asked him why he was so distraught, the defendant stated that he had been told by a Kansas City detective that a warrant had been issued— or soon would be—for his arrest. Finally, the two police officers wrested the knife from him, read him the *Miranda* warning and took him to the police station.

Defendant claims that the trial court erred in overruling his motion for acquittal at the close of all the evidence because the evidence was not sufficient to establish that he had performed the alleged acts of sodomy and sexual abuse. He argues that six-year-old Theresa was the only witness against him and that her uncorroborated testimony was so contradictory and unreliable that the element of identity was not established beyond a reasonable doubt.

He points to Theresa's affirmation on cross-examination that she had at one time told both her grandmother and her mother that her natural father had committed the offenses, not the defendant. Likewise, her mother conceded that the child may have implicated her real father instead of the defendant during a conversation on June 2, 1985, but that she could not recall. According to the defendant, those contradictions are particularly significant in that both men were well known to the victim— one being her natural father and the other being her stepfather. Theresa and her brother each testified that they called both men "Daddy." The defendant intimates that the children's natural father had access to them during an overnight visit close to the time the events allegedly occurred, although their mother testified that he was never alone with his daughter at that time. Finally, the defendant points out that the little girl's testimony was not corroborated by any independent evidence. No one else witnessed any part of the incident and a medical examination performed about one month later disclosed no physical problem except an unexplained redness on her legs.

■ In reviewing the sufficiency of the evidence to support the verdict, we must consider all substantial evidence of the facts and the inferences readily drawn from such evidence in the light most favorable to the verdict and must reject all evidence and inferences to the contrary. *State v. Van Orman*, 642 S.W.2d 636, 637 (Mo.1982); *State v. Taylor*, 445 S.W.2d 282,

---

**2.** Detective Taylor was the officer who took Theresa's statement in late May, 1985.

**3.** The defendant was charged with sex offenses in three cases: two involving Theresa and one

involving David. The morning of trial, the court called all three cases, apparently intending to try them all. However, only the two cases involving the girl were tried.

284 (Mo.1969); *State v. Whitaker,* 275 S.W. 2d 316, 319 (Mo.1955). Substantial evidence is evidence from which the trier of fact reasonably can find the issue in harmony with that evidence. *State v. Taylor, supra; State v. Whitaker, supra;* and *State v. Gregory,* 339 Mo. 133, 96 S.W.2d 47, 52 (1936).

▉ The victim's uncorroborated testimony is sufficient to support the submission of charges of rape or sodomy. *State v. Smith,* 679 S.W.2d 899, 902–03 (Mo.App. 1984), citing *State v. Rogers,* 583 S.W.2d 293, 295 (Mo.App.1979). "It is only in those cases where the evidence of the prosecutrix is of a contradictory nature or, when applied to the admitted facts in the case, her testimony is not convincing and leaves the Court clouded with doubts that she must be corroborated or judgment cannot be sustained." *State v. Ellis,* 710 S.W. 2d 378, 380 (Mo.App.1986) (en banc), quoting *State v. Baldwin,* 571 S.W.2d 236, 239 (Mo.1978) (en banc). Corroboration is required not because the testimony of the victim cannot stand alone, but because the law does not allow an inference of fact from evidence not substantial or probative of that fact. *Smith, supra* at 902.

▉ To trigger the application of the corroboration rule, the victim's testimony must be "so contradictory or in conflict with physical facts, surrounding circumstances, and common experience as to be unconvincing." *State v. Sipes,* 651 S.W.2d 659, 660 (Mo.App.1983). The corroboration rule does not apply, however, where the inconsistency or even contradiction bears on a proof not essential to the case. *State v. Salkil,* 659 S.W.2d 330, 333 (Mo.App. 1983). *See also Ellis, supra* at 380–81; *State v. Johnson,* 595 S.W.2d 774, 776 (Mo. App.1980); *State v. Mazzeri,* 578 S.W.2d 355, 356 (Mo.App.1979).

▉ Here, the state argues that because the child's prior inconsistent statements about the identity of her molester were out-of-court statements made to her mother and grandmother rather than testimonial statements made at trial and because she never wavered in her testimony at trial that the defendant committed the offenses, the corroboration rule does not apply. Although some debate exists as to what inconsistent statements can be considered to determine whether to apply the rule (*see Ellis, supra,* 710 S.W.2d at 381), a reading of Missouri cases in point reveals that courts have based that determination on inconsistent statements made at trial, at a deposition, out of court to a third party, and various combinations of those sources. *See e.g. State v. Harris,* 620 S.W.2d 349, 353–54 (Mo.1981) (en banc); *Smith, supra,* 679 S.W.2d at 902–03; *State v. Bursley,* 548 S.W.2d 586, 588 (Mo.App.1976).

The state analogizes the facts at bar to those of *State v. Ellis, supra* at 381, where the court held that the eleven-year-old victim's prior inconsistent statements concerning the dates of the offenses did not cause her trial testimony to be less than substantial evidence. There, the court noted that at trial the witness remained firm in her testimony as to the dates and reasoned that, in view of her age and the numerous prior statements she had given, inconsistencies were likely to develop. Moreover, the victim explained the inconsistencies on the record. *See also Harris, supra,* 620 S.W.2d at 353–54. The court wrote (at 382), "It is significant neither the extensive pretrial inquisitions of the victim nor her extensive cross-examination at trial developed any inconsistencies concerning the essential facts of the offense." However, the *Ellis* court distinguished the prior inconsistent statements about the dates from the totally contradictory in-trial testimonial statements of victims going to the heart of the offenses in *State v. Bursley, supra,* 548 S.W.2d 586, where this court, applying the corroboration rule, reversed and remanded for a new trial. *See also State v. Presley,* 694 S.W.2d 867, 870 (Mo.App. 1985); *Smith, supra,* 679 S.W.2d at 902– 03.

In *Bursley,* the defendant was convicted of sodomizing Gary and Robert, teen-aged boys. At first, Gary testified that he did not witness the assault on Robert, but after an overnight adjournment he said that he did, but was too embarrassed to say so. Then, Gary testified that he was not sure Robert watched when the defendant beat him with a blackjack. Later, he stated that Robert was not in the room during the

beating. Defense counsel produced the boys' depositions, inconsistent with their in-court testimony on a number of significant points. In contrast with his trial testimony, Robert had denied that defendant had sodomized or beat him. Robert could not explain the discrepancies. Moreover, examination of the boys at trial revealed a possible motive for the boys to have fabricated the charges—the defendant had failed to pay them the wages he owed them. *See also State v. Phillips*, 585 S.W. 2d 517 (Mo.App.1979) (rape conviction reversed where victim's contradictory testimony was not corroborated).

The present facts are much more like those in *Bursley* than the facts in *Ellis*. Although Theresa's in-court testimony that defendant committed the acts was firm, her prior out-of-court statements go to an essential element of the offense, the question of the perpetrator's identity. She admitted on cross-examination that she told both her grandmother and her mother that her natural father had molested her instead of the defendant. The record shows no explanation for the inconsistency. Her natural father stayed overnight at the Kuzma house during the relevant time period. According to the child's mother, however, he was never alone with her. Also, the child referred to both her father and her stepfather as "Daddy." Although she herself did not present a motive for fabricating the charges against her stepfather, her mother admitted making phone calls to the defendant threatening to make things worse for him and indicating that she would not have instigated the prosecution if he had not moved out of their house.

The state relies on *State v. Johnson*, 595 S.W.2d 774 (Mo.App.1980), for the proposition that the corroboration rule "has been held not to be applicable where the testimony of a prosecutrix was contradictory concerning who of four men committed the offense and who helped her escape." Taken out of context, that statement is dangerously misleading. In *Johnson*, the victim unequivocally identified the defendant as one of three men who raped and sodomized her. The identity issue in that case concerned the identity of the man who helped her to escape, not the identity of the perpe-

trator. At trial, the victim testified that a fourth man, who had not participated in the sexual offenses, helped her to escape, in contrast with her earlier statement that one of the three perpetrators had relented and allowed her to leave the morning after the incident. *See also State v. Gillespie*, 649 S.W.2d 447, 448 (Mo.App.1982), where the defendant claimed that the nine-year-old victim's testimony was inadequate to identify him. The court sustained the convictions of kidnapping and sodomy on the basis of the victim's uncorroborated testimony for the following reasons: the trial court had found that the victim was a competent witness, and her identity testimony showed that she had observed the defendant for half an hour in daylight, had identified him both at a four-man lineup and later in court, and had viewed defendant's car and his hat inside the car, both of which fit the description she had given police.

Taken as a whole, the child's identity testimony leaves the mind of the court clouded with doubts, and, therefore, requires corroboration. The state proffers the following corroborating evidence: Mrs. Kuzma testified that Theresa was more "wound up" in late May. Although defendant tried to implicate the girl's natural father as the perpetrator of the crime, the natural father stayed at the house only one night in May and, according to Mrs. Kuzma, was never alone with Theresa. In contrast, the defendant was alone with her several hours each day and had an opportunity to commit the offenses. Finally, the jury could infer that the defendant, who admitted that he was on his way to the Clay County jail to "turn himself in," attempted to castrate himself because he felt guilty for the offenses he committed.

The nature of the corroborating evidence before us falls far below the standard suggested in other cases. A mere opportunity to commit the offenses does not corroborate contradictory or conflicting evidence. *Bursley, supra*, 548 S.W.2d at 589–90. No one else witnessed any part of the alleged incident, and the belated medical examination revealed nothing significant. Each of the children told stories that contradicted themselves, so that David's may not be held to corroborate Theresa's, *Bursley* at

590, and the state has not contended that it may.

To be sufficient to permit the jury to resolve the conflict between Theresa's two stories and thus to enable the jury to find defendant's guilt beyond a reasonable doubt, the purported corroboration should itself have been substantial evidence. In this case, substantial evidence would have been evidence from which the jury reasonably could have determined which of the child's conflicting accusations was true. *State v. Taylor, supra; State v. Whitaker, supra;* and *State v. Gregory, supra.* Viewed in that light, the evidence of defendant's apparent attempt to commit suicide or to castrate himself creates ambiguous implications insufficient to corroborate either of Theresa's contradictory stories. More than that is required to put a man in the penitentiary. *Cf. State v. Phillips, supra,* 585 S.W.2d 517, 521.

Accordingly, we reverse the judgment and order that the defendant be discharged.

All concur.