**STATE of Missouri, Respondent,**

v.

**Rory L. GRIGGS, Appellant.**

No. WD 54594.

Missouri Court of Appeals, Western District.

Submitted Aug. 20, 1998.

Decided Dec. 8, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 2, 1999.

Application for Transfer Sustained March 23, 1999.

Case Retransferred Sept. 21, 1999.

Court of Appeals Opinion Readopted Oct. 1, 1999.

236

Kent Denzel, Asst. Public Defender, Columbia, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SMART, P.J., ELLIS and HOWARD, JJ.

SMART, Judge.

On May 8, 1997, after a jury trial, Rory L. Griggs was found guilty of statutory sodomy in the first degree, § 566.062, RSMo 1994.[1] On June 30, 1997, Griggs was sentenced to a term of sixteen years' imprisonment as a prior offender under § 558.016.2. Griggs appeals his conviction on three grounds. Griggs first contends that his conviction cannot be sustained because the evidence against him, consisting solely of the victim's out-of-court statements regarding the incident, was inconsistent, contradictory and uncorroborated. Griggs next contends that the State failed to comply with § 491.075.3 by not disclosing statements the victim made to a counselor to which the counselor later testified. Griggs finally argues that the trial court erred in not declaring a mistrial when, during its closing argument, the State told the jury that the victim was concerned about being exposed to Griggs again, thus leading the jury to convict Griggs for reasons wholly irrelevant to his guilt.

### Factual Background

In August, 1995, Jeannene Pontius began caring for her four grandchildren including Danny, the victim, who was then six years old.[2] Ms. Pontius began caring for the children when their mother began serving a one-year jail sentence. The children's father had been in prison for some time. The children, including Danny, had problems dealing with the absence of their mother and began seeing Nina Schunck, a counselor, to help them through their difficulties. Ms. Schunck observed that Danny tended to say things he believed to be appropriate and "mimick[ed] the desire[s] of family members[.]" She diagnosed him with "adjustment disorder."

Ms. Pontius and her husband scheduled a trip for the weekend of April 27, 1996. Danny's paternal grandmother, Sharon Griggs, agreed to look after Danny and his brother in her home, during Ms. Pontius' absence. At that time, Defendant Rory Griggs, along with several other individuals, was residing at Sharon Griggs' home. Defendant Griggs was Danny's uncle. When Ms. Pontius picked up Danny and his brother from Grandmother Griggs' home on Sunday evening, she noticed that Danny was whiny and "teary-eyed, feeling down and scared." Shortly thereafter, several changes were noted in Danny's behavior. Danny became mean, hateful and aggressive; he whined and cried a lot; and his teacher noticed that he was aggressive toward other children but was clinging to her, not wanting to leave her. Ms. Schunck also noted changes in Danny's behavior and reported that during one session, Danny approached her and touched her breast. Ms. Schunck indicated that this behavior suggested that Danny had been the victim of sexual abuse.

Approximately three weeks later, on May 17 or 18, 1996, while riding in the car, Danny put his head in his brother's lap and "tried to bite [his] privates." When the family returned home, Ms. Pontius took Danny aside and asked if someone had touched him or if something had happened to him. She assured Danny that he would not get in trouble and could tell her the truth. Ms. Pontius stated that Danny

---

1. All statutory references are to Revised Statutes of Missouri, 1994, unless otherwise indicated.

2. The name of the victim has been changed in this opinion to help protect his identity.

"seemed on the verge of tears" and after more reassurance, told them about an incident which he said happened over the weekend. Ms. Pontius testified:

> So he said, well he was down at Grandma Griggs', and he was inside watching TV with Rory and Jesse.[3] And I said, "What happened?" And he says Rory tried to put his private in his mouth. He says he tried five times and on the fifth time he got it in. And he said, he said, "Then I went and got a drink of water to rinse out my mouth 'cause I didn't want to get any germs."

Danny told Ms. Pontius that the incident occurred in the living room. He told her that his brother was outside playing at the time of the incident and that Grandmother Griggs was in the bathroom. Ms. Pontius noted that after telling her what happened, Danny seemed relieved and not so scared.

Ms. Pontius then telephoned Barbara Oliver, a counselor, and told her what Danny had said. Ms. Oliver directed her to call the child abuse hotline. While she waited for investigators from the Division of Family Services ("DFS") to speak with Danny, Ms. Pontius took Danny to stay at his great-grandmother's home.[4] The day after he arrived, while watching television at Mimi's home, Danny began crying and "hollering" to Mimi to turn the television off. When asked what was wrong, Danny replied, "I'm a bad boy, I'm a bad boy. . . . You won't love me no more. You won't like me. I'm a bad boy." Mimi assured him that she would still love him no matter what he told her.

Shaking and crying, Danny said, "Mimi, . . . you know when I was at Grandma Sharon's house? . . . Uncle Rory hurt me." Danny went on to tell Mimi that when he was watching television, Griggs and Jesse James took their clothes down and made Danny take his clothes down. They then made him kiss them and "they messed with [him]." Danny told Mimi that Griggs and his friend "put their thing in [his] mouth;" and "came" in his mouth so that Danny had to "go wash [his] mouth out, 'cause it was choking [him].' " Mimi asked that Danny tell her again what had happened, which he did. In the re-telling of his story, Danny told Mimi the same thing he had just finished telling her. Mimi then called DFS and reported what Danny had told her.

On May 28, Danny's counselor, Ms. Schunck, asked Danny about the incident. At first Danny told her that he did not remember what had happened. Ms. Schunck encouraged Danny to talk about what had happened, and eventually he did. Ms. Schunck wrote in her session notes that Danny told her that "his uncle and a friend made him perform fellatio and then kiss their butt[s]." She could not recall Danny's exact words. In subsequent sessions, Danny indicated to Ms. Schunck that he was afraid that people would not believe him and that he was afraid to return to Grandmother Griggs' home.

Danny was interviewed by Detective Wilson on May 21, 1996. During that interview, he told Detective Wilson that Griggs and Jesse James made him kiss their "rear end[s]" and placed their penises in his mouth.

Rory Griggs was arrested on December 10, 1996, for sexually abusing his nephew. At approximately 11:00 that evening, Rex Griggs, Sr., Danny's father,[5] received a phone call telling him of Rory's arrest. Upon hearing the news, without saying a

---

3. Danny identified Rory's friend who was present during the abuse as "Jesse James." At trial, Jesse James was identified as Chad Gorrell.

4. Danny refers to his great-grandmother, Wilma Miller, as "Mimi." Therefore, we will refer to her as Mimi in our opinion.

5. Rex Griggs, Sr. was released from prison after the abuse occurred. Sometime in November, 1996, Jalalia Miller (Danny's mother), Danny and Danny's siblings moved in with Rex Griggs, Sr. Ms. Miller testified at trial that this was the first time since 1988 (shortly after Danny was born) that the entire "family" lived together.

word to Danny's mother, Rex went straight to Danny's room and woke him. He marched Danny downstairs where he told Danny that Rory had been arrested. Danny started crying the moment he was marched downstairs and cried throughout the entire confrontation. His father told Danny that he "want[ed] the truth from [him]." When Danny told Rex what had happened, Rex asked, "Why would [Rory] do such a thing like that to you?" Danny then told his father that he had made the entire story up to get back at Rory for threatening to spank him. At this point, Rex Griggs went upstairs and woke up the other children. All the children were then taken to Grandmother Griggs' home to discuss Rory's arrest with the rest of the Griggs family. Shortly after Rory was arrested, Danny walked in on a conversation between Grandmother Griggs and Randy Griggs, Rory's brother, about Rory's arrest. Danny told Grandmother Griggs that "if they'd just come and asked me if Uncle Rory done that to me ... I coulda told 'em ... Uncle Rory didn't do nothing to me.... He just made me mad and I told him not to."

On December 16, 1996, Ms. Stephanie Duvall, a Children's Service Counselor with DFS, met with Danny for the first time. When asked if there was anything going on at home he wanted to talk about, Danny immediately told her that he had made up the story about what Griggs did to him. Ms. Duvall testified that Danny told her:

> he was mad at his uncle because he threatened to spank him, and he had got—he had went outside on the porch and thought about what he was going to say, and that's how he came up with the story. And he had come up with that story of such explicit sexual things from watching a movie and hearing other people talk about it.[6]

Danny then told Ms. Duvall that Uncle Randy told him that he had gotten his Uncle Rory in a lot of trouble. Randy told Danny that Rory would have to spend a lot of time in jail for what Danny said Rory had done. Danny told Ms. Duvall that "he never would have said anything if he [had] known it would have caused so much trouble."

Ms. Duvall scheduled a meeting with Danny's parents on December 17, 1996, to discuss the allegations, but Danny's parents failed to show up. Because of Danny's parents' failure to show up, Ms. Duvall concluded that their home might not be the healthiest environment for Danny to be in. She requested that his parents move Danny to Mimi's home. Danny's parents moved Danny into Mimi's home a few days later.

On December 30, 1996, Danny began seeing Joyce Estes, another counselor. At his first session, Danny told Ms. Estes that "people th[ought] Uncle Rory did things to [him], but he didn't." When asked what people thought Rory had done, Danny refused to tell her, stating that he did not want to tell her because she would not believe him. Ms. Estes then began questioning Danny about nightmares he was having. Danny told her that he believed he had been removed from his mother's home, separated from his brothers, and sent to Mimi's home as punishment for telling people about the abuse.

During Danny's counseling session on January 6, 1997, Danny was fidgeting, angry and restless. He told Ms. Estes that Rory did not do anything to him. At his session on January 9, 1997, Danny again told Ms. Estes that nothing happened. However, when Ms. Estes asked Danny why Mimi thought something had happened, he replied, "If the story was true, it happened at Grandma Griggs' house." Ms. Estes further testified:

> He said Rory and Jesse James, that was the only, the other person that was there, we were the only ones in the

---

**6.** When asked whom he had heard talking about such explicit things or the movie in which he had seen them, Danny could not remember.

house, everyone else was out on the porch. Danny said he was watching the news. Rory and Jesse were in another bedroom. Rory and Jesse came in the living room, made him suck their—I have the word "penis," it's actually—he, he calls it their things, their privates, made him suck their penises.

Ms. Estes also testified as to Danny's demeanor:

I know he was very embarrassed. It was very gross. He became very, very upset anytime I would even mention the word "penis." That was a very disgusting, embarrassing thing to him. I'm trying—he said he felt stupid, people would laugh at him and think that he was bad.

During a home-visit on January 10, 1997, Mimi told Ms. Duvall that while Danny was visiting his parents' home, Griggs called from prison to speak with Danny's father. Danny's father handed Danny the phone and asked Danny if he had anything to say to "Uncle Rory." Danny replied, "Just tell him hi and I'm sorry."

At a counseling session with Ms. Estes on January 20, 1997, Danny talked about being afraid when his mother and father fought. Additionally, Danny told Ms. Estes that he felt guilty that he was the one who put his Uncle Rory in jail. Ms. Estes told Danny that Griggs was in jail because of his own actions, not anything that Danny had done. At this session, Danny mentioned that Griggs had called the house, and Danny had spoken with him briefly. In her session notes, Ms. Estes made the observation that Danny felt he could not go home to live with his mother, father and brothers until he had convinced everyone that his Uncle Rory did not do anything to him.

On January 28, 1997, Jalalia Miller, Danny's mother, attended the counseling session with Danny. Ms. Miller stated, in Danny's presence, that she believed that Griggs had abused Danny. Ms. Miller told Ms. Estes that she herself had been abused as a child and that nobody had

believed her. After his mother's disclosure, Danny told both women, "I told you Rory didn't do anything." With Danny still in the room, Ms. Estes began telling Ms. Miller that children are often afraid to tell their stories. Danny admitted that he was afraid of what Rory would do to him when he got out of jail, and that he was afraid of his father. Ms. Miller assured Danny that she would protect him. At this point, Danny stated, "My first story was true."

On January 29, 1997, Ms. Duvall conducted another home-visit at Mimi's home. Danny told her that he was upset because his father often called Mimi's house to talk to Danny's mother; however, his father would never talk to him. Ms. Duvall testified to the following unsolicited statements made by Danny during the home-visit:

And he asked me if I know what the truth meant, and I replied yes. Danny said—he then said, "Well, that's what I did." And I said, "You told the truth? Can you tell me what the truth is?" And he said, "Yes, story number one was true." And then I, and then I replied, to clarify with Danny, "Are you telling me that what you said your Uncle Rory did to you really happened?" And he said, "Yes."

On February 11, 1997, Ms. Miller again attended Danny's counseling session with him. At this session, Ms. Estes and Ms. Miller told Danny that Griggs had been released on bond from jail. Danny became very angry and upset, and asked who paid the bond. Danny denied being afraid, stating that he knew Mimi, his mother and Ms. Estes would protect him. Ms. Estes then began role-playing with puppets. When she asked Danny to show her, on a dog puppet, where Rory had touched him or where he had touched Rory, Danny pointed out the genitals and "under the tail." Danny also said he "felt really, really yucky and ... wanted to throw up" when Griggs placed his penis in Danny's mouth.

At their session on February 19, 1997, Ms. Estes told Danny that he might have to testify at trial against Griggs. Danny became very upset and frightened, telling Ms. Estes that he would not testify. Ms. Estes told Danny that sometimes the court will allow someone else to testify for the child and asked Danny to tell her exactly what happened while she wrote it down, in case the court allowed her to testify for him. Danny told Ms. Estes the following:

> I was sitting in the recliner watching TV. The news was on. Rory and Jesse were in the bedroom. Grandma was on the front porch. Jesse and Rory came into the front room and said, "Don't tell anybody." Rory pulled down his pants and stick it in my mouth. He kept it in my mouth. I tried to get it out, and he shoved it back in. Jesse was sitting down laughing. Then Jesse pulled his pants down and stuck it in my mouth. He pulled it out, and they went back to the bedroom, saying, "Don't tell anyone."

Rory Griggs' trial began on May 5, 1997. Danny did not testify at trial. Instead, pursuant to § 491.075, others who had spoken with Danny after the incident were permitted to testify as to what Danny had told them. On May 8, 1997, after hearing all the evidence, a jury convicted Rory Griggs of statutory sodomy in the first degree, § 566.062. On June 30, 1997, Griggs was sentenced to sixteen years in prison. Griggs raises three points on appeal.

### The Corroboration Rule

■ Griggs first argues that Danny's statements about the events leading to Griggs' conviction were so contradictory and inconsistent that the State must corroborate them to sustain his conviction. Generally, the uncorroborated testimony of a victim is sufficient to sustain a conviction for sexual assault. *State v. Sladek*, 835 S.W.2d 308, 310 (Mo. banc 1992). However, where the testimony is of such a contradictory nature that it is deprived of probative force, the testimony must be corroborated or the judgment cannot be sustained. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995); *State v. Baldwin*, 571 S.W.2d 236, 239 (Mo. banc 1978). This rule, known as the corroboration rule, is triggered where the victim's testimony is "so contradictory or inconsistent as to deprive it of all probative force." *Silvey*, 894 S.W.2d at 673.[7]

Danny did not testify at trial. Therefore, there is no conflicting trial testimony. The trend in Missouri has been to limit the application of the corroboration rule to the victim's trial testimony. *See, e.g., State v. Harris*, 620 S.W.2d 349, 353–54 (Mo. banc 1981) (application limited to the victim's testimony at trial); *State v. Gatewood*, 965 S.W.2d 852, 856 (Mo.App.1998) (rule applied to victim's testimony); *State v. George*, 921 S.W.2d 638, 643 (Mo.App.1996) (refusing to apply the rule to conflicts between the victim's testimony and the victim's out-of-court statements); *State v. Graham*, 906 S.W.2d 771, 778 (Mo.App. 1995) (stating the rule applied only to trial testimony and not to out-of-court statements). In this case, we need not specifically decide whether the corroboration rule applies to the out-of-court statements (in the context of a case submitted entirely on out-of-court statements) because we conclude, for reasons discussed below, the corroboration rule does not apply in this case anyway.[8]

---

**7.** In *Silvey*, the court altered the formulation of the corroboration rule somewhat, stating that the test is whether the testimony is "so contradictory or inconsistent as to deprive it of all probative force." 894 S.W.2d at 673. Thus, there may not be much difference between applying the corroboration rule and applying the usual standard: whether the evidence is sufficient to persuade a reasonable juror that each of the elements of the crime was proven beyond a reasonable doubt. *State v. O'Brien*, 857 S.W.2d 212, 215 (Mo. banc 1993).

**8.** There is one aspect of this case which in our view warrants comment, although the issue has not been raised on this appeal. Defendant in this case was convicted entirely on the

### Danny's Contradictions as to Non–Essential Matters

The corroboration rule does not apply to inconsistencies or contradictions bearing on proof not essential to the case. *State v. Kuzma,* 751 S.W.2d 54, 58 (Mo. App.1987). Missouri courts have recognized that statements of children are inherently more likely to seem contradictory, simply because children are less skilled in articulation. "[I]nconsistent or contradictory statements by a young child relating a sexual experience do[ ] not, in [themselves], deprive the testimony of all probative force." *Silvey,* 894 S.W.2d at 673. "It is not uncommon for there to be some contradiction or memory lapses during the testimony of a child of tender years." *State v. Harvey,* 641 S.W.2d 792, 800 (Mo. App.1982) (quoting *State v. Ginnery,* 617 S.W.2d 115, 117 (Mo.App.1981)). Thus, where the victim's statements have been inconsistent in collateral matters, no cloud of doubt is created and no corroboration is necessary. *Baldwin,* 571 S.W.2d at 239.

There are several apparent inconsistencies in Danny's statements regarding the sexual abuse. Danny told Grandmother Pontius that he was watching television with Rory and Jesse James in the living room when Rory "tried to put his private in [Danny's] mouth." Danny told Ms. Pontius that his uncle tried five times to put his penis in Danny's mouth before he got it in.

The next day, Danny told Mimi that he was watching television alone and that Rory and Jesse James came out of a closed room where they had been watching videos. Danny said that the men took down his pants, took down their own pants, and then "made [Danny] kiss them [and] messed with" Danny. Danny said the men "put their thing[s] in [his] mouth," and he had to wash out his mouth because it was choking him.

Shortly thereafter, Danny told Detective Wilson that he was made to kiss both mens' "rear ends" and that both men placed their penises in his mouth. Later that month, Danny told Ms. Estes the following story:

[I] was sitting on the recliner watching TV. The news was on. Rory and [Jesse James] were in the bedroom. Grandma was on the front porch. [Jesse James] and Rory came into the front room and said, "Don't tell anybody." Rory pulled down his pants and stuck it in my mouth. He kept it in my mouth. I tried to get it out, and he shoved it back in. [Jesse James] was sitting down laughing. Then [Jesse James] pulled his pants down and stuck it in my mouth. He pulled it out, and they went back to the bedroom, saying, "Don't tell anyone."

Statutory sodomy is defined as having deviate sexual intercourse with another person who is under the age of fourteen. § 566.062.1, RSMo 1994. "Deviate sexual intercourse," in relevant part, is defined as "any act involving the genitals of one person and the mouth ... of another person." § 566.010(1), RSMo 1994. Whether Danny's grandmother was in the bathroom, at the grocery store, or on the front porch is not essential to the issue of whether Rory placed his penis in Danny's mouth. In one version, Danny said his pants were pulled down, and Griggs and Jesse James "messed with" Danny. In other versions, he made no mention of this act. But again, whether his pants were down and

basis of the victim's out-of-court statements received pursuant to § 491.075. The trial court's docket sheet shows that the parties entered into a stipulation in which each party waived objection to the other party's "proffered statements of the subject child under RSMo § 491.075." Thus, defendant appears to have waived objection to the lack of opportunity to confront and cross-examine his ac-

cuser. This statute has been upheld as against a constitutional challenge related to the right of confrontation. *State v. Wright,* 751 S.W.2d 48 (Mo. banc 1988). However, our research suggests that the statute has not been challenged since the latest amendment relaxing the requirement of non-availability of the witness.

whether they "messed with him" was not essential to the issue of whether the charged deviate sexual intercourse occurred. The same applies to whether Danny was watching television alone or while the two men were watching videos, or whether the men were watching television with him before the alleged incident. Whether or not Danny kissed the men's rear ends is also not essential to the offense charged. A jury may decide that these non-essential discrepancies are attributable to memory lapses and the articulation difficulties of a six-year-old child, or a jury might decide that these discrepancies constitute a reason to disbelieve the testimony. In any event, they all go to non-essential elements of the case; therefore, the corroboration rule does not come into play as to these discrepancies. *Kuzma,* 751 S.W.2d at 58. The issue of whether the corroboration rule applies is not, of course, the same thing as whether the victim's statements are credible. The jury may reject the testimony. The corroboration rule is simply a rule about whether the jury even gets to decide credibility.

### The Recantations

■ After Griggs was arrested for sexually abusing Danny, Danny began recanting his story. These recantations related to the essential elements of the crime charged. Although the jury believed that the crime occurred, this court must determine whether a cloud of doubt has been created for which we must find corroboration in the record to sustain Griggs' conviction. We must decide whether Danny's statements are so "contradictory or inconsistent as to deprive it of all probative force." *Silvey,* 894 S.W.2d at 673. Any inconsistencies or contradictions in testimony relating to essential elements of the case must be considered against the backdrop of the entire record. *Harris,* 620 S.W.2d at 354. *See also Harvey,* 641 S.W.2d at 800 (stating that where child victim stated out-of-court that she had been raped by the defendant but at trial testified that she had not been raped, the

entire record must be scrutinized and all the surrounding circumstances must be reviewed to determine whether there was substantial evidence to support a conviction).

■ In the present case, Danny first presented his allegations almost immediately after the weekend in question. He told similar stories to his grandmother, great-grandmother, counselor and Detective Wilson. In each instance Danny stated that his uncle Rory had put his penis in Danny's mouth. After Danny told Mimi of the incident, she asked him to repeat the story to her again. Danny did so and the story he repeated was identical to the first story.

On December 10, 1996, Griggs was arrested. After the arrest, Danny completely recanted his allegations, not just once, but consistently over a period of six weeks from the arrest of Griggs until January 28, 1997. At the same time, the recantations were not without obvious reason. Danny's father treated his allegations with overt skepticism, if not rejection. Next, Danny became aware that he had "caused a lot of trouble" by his allegations. His Uncle Randy also told him that his Uncle Rory would have to spend "a lot of time in jail" because of Danny's accusations. One week after his uncle's arrest, DFS decided to remove Danny from his mother's home and placed him in Mimi's home. While he was there, his father declined to speak to him, even when his father would call to speak to someone else. Under the circumstances, the recantations by Danny do not so undermine the credibility of his initial allegations as to cause the earlier statements to be deprived of all probative force.

Defendant fails to provide us with specific authority that in a case such as this, where the victim recants, either at trial or out of court, but where a clear reason appears for the recantation, the corroboration rule applies. In some respects, this case is similar to *State v. Blue,* 811 S.W.2d 405 (Mo.App.1991) and *State v. Fraction,*

782 S.W.2d 764 (Mo.App.1990).[9] In both of these cases, the defendant was convicted based on out-of-court statements of the child-victim although the respective victims denied at trial that the defendant was guilty of the charged conduct. In *Blue*, although it is unclear why the victim recanted her accusations at trial, the trial court stated that the circumstances of that case made it different from "cases which look for corroborating evidence" to support a victim's testimony. *Blue*, 811 S.W.2d at 409. In *Fraction*, where there was evidence that the victims' mother had asked them to lie at trial, it appears that the defendant did not raise the corroboration rule as an issue on appeal. *Fraction*, 782 S.W.2d at 767. While neither of these cases are directly on point, we also are not aware of any authority for the proposition that the corroboration rule must be applied in a case like this. Where there were obvious reasons for the recantation, we conclude that the effect of the recantations were properly left for the jury. The recantations and the circumstances thereof were for the jury to consider. We reject the argument that Danny's recantations required the application of the corroboration rule.

### Ms. Schunck's Testimony

■ Griggs' next point concerns the admissibility of out-of-court statements Danny made to Ms. Nina Schunck regarding the abuse. Griggs alleges that the trial court erred in admitting testimony of Ms. Schunck relating to statements Danny made to her. Griggs contends that the State failed to disclose the statements to him before the trial as required under § 491.075, and therefore he was afforded no opportunity to meet the statements. Griggs believes that the admission of Ms. Schunck's statements violates his right to due process of law and his right to a fair trial as guaranteed by the United States and Missouri Constitutions. Our review of the trial court's decision to admit Ms. Schunck's testimony is limited to whether such decision was an abuse of discretion. *State v. Redman*, 916 S.W.2d 787, 792 (Mo. banc 1996).

Griggs argues that Ms. Schunck testified at trial as to what she had written in her notes, not Danny's exact words. The defense points out that § 491.075 encompasses "statements" of the child, not other's recollection or summary of the victim's statements. It is true that Ms. Schunck summarized what Danny had told her on May 28, 1996, and at trial was unable to recall Danny's exact statement. There is authority, however, for the proposition that non-verbatim § 491.075 testimony may be used to support convictions. *See, e.g., State v. White*, 873 S.W.2d 874, 877 (Mo.App.1994).

In a pre-trial 491.075 hearing, Griggs stipulated to the admissibility of "statements that ha[d] been either brought out at the last hearing or that [we]re included in *disclosure that has been provided to defense counsel*." (Emphasis added). At trial, the State asked Ms. Schunck about statements Danny had made to her at his counseling session on May 28, 1996. Griggs objected that such statements were not disclosed to the defense in accordance with § 491.075.3. In his brief, Griggs argues that his stipulation covered only *disclosed* statements and that Danny's statements contained only in Ms. Schunck's memory were not disclosed to the defense.

■ Griggs' argument overlooks the fact that the prosecution provided the defense with a copy of Ms. Schunck's session notes in pre-trial discovery. In those session notes, Ms. Schunck had written that Danny told her on May 28 that Griggs and a friend "[m]ade him perform fellatio." At trial, Ms. Schunck stated that she was unable to remember Danny's exact words, but she had written in her session notes

---

**9.** *Fraction* has been criticized on other grounds. *See State v. Lachterman*, 812     S.W.2d 759, 767 (Mo.App.1991).

that Danny had told her that Griggs and a friend "[m]ade him perform fellatio." At trial, Ms. Schunck read from her session notes. Therefore, the statements to which Ms. Schunck testified were disclosed to the defense, and the defense stipulated to their admissibility. Because Griggs stipulated to the admissibility of Ms. Schunck's statements at trial, he is bound by that stipulation on appeal. *State v. Hurt*, 931 S.W.2d 213, 214 (Mo.App.1996).

Section 491.075.3 provides:

A statement may not be admitted under this section unless the prosecuting attorney makes known to the accused or his counsel his intention to offer the statement and *the particulars* of the statement sufficiently in advance of the proceedings to provide the accused or his counsel with a *fair opportunity to prepare to meet the statement.*

(Emphasis added).

As stated before, Griggs was furnished with a copy of Ms. Schunck's session notes in pre-trial discovery. Those notes indicated that Danny had told her that Griggs and a friend "[m]ade him perform fellatio." The issue then becomes whether that statement was particular enough to allow Griggs *a fair opportunity* to meet the statement. We find that it was and that Griggs had a fair opportunity to meet the statement.

For all the foregoing reasons, Point II is denied.

### State's Closing Argument

Griggs' final point on appeal is that the trial court erred in failing to declare a mistrial during the State's closing argument. Griggs argues that during its closing argument, the State asked the jury to convict Griggs to prevent future harm to Danny. Griggs states that this argument led the jury to convict him for reasons wholly irrelevant to his guilt, violating his rights to due process of law and to a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 18(a) of the Missouri Constitution.

Declaration of a mistrial is within the sound discretion of the trial court, and should be granted only where the prejudice cannot be removed any other way. *State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995). The trial court has broad discretion in determining the scope of closing arguments. *State v. Nicklasson*, 967 S.W.2d 596, 615 (Mo. banc 1998). Unless an abuse of that discretion prejudices the defendant, we will not disturb the trial court's ruling on such matters. *State v. Rousan*, 961 S.W.2d 831, 851 (Mo. banc 1998). We will reverse a conviction on the grounds of improper argument only if the defendant establishes that the comments had a decisive effect on the jury's verdict or that the argument was "plainly unwarranted." *State v. Petty*, 967 S.W.2d 127, 135 (Mo.App.1998).

A defendant is on trial for the crime he is alleged to have committed in the past, not for what he might do in the future. *State v. Chapman*, 936 S.W.2d 135, 140 (Mo.App.1996). The State may not refer to a defendant's criminal proclivities during closing arguments or suggest the jury convict him to prevent him from committing future crimes. *Id.* Additionally, the State should not speculate regarding future crimes the defendant *may* commit. *State v. Schaefer*, 855 S.W.2d 504, 507 (Mo.App.1993).

Missouri court's have addressed this question several times in the past. In *State v. Rich*, 950 S.W.2d 337, 340 (Mo. App.1997), the State argued in closing:

What is the defense? The defense is he has a mental defect that compels him, or so he claims, to sodomize and rape little girls; that somehow or another we ought to give him a break because he is driven to sodomize, kidnap, and rape children in our county.

* * *

Anybody that goes out and commits these kinds of acts on children obviously has got some problems.

* * *

The psychologist said he needs to be separated from the rest of society and he needs never be given access to small girls again.

The Court of Appeals found that the State was simply re-stating the defendant's "mental disease" defense and refused to find the State was commenting on the defendant's future dangerousness. *Id.*

In *Schaefer*, 855 S.W.2d at 507, the prosecutor asked the jury in closing argument, "Now what can you do to safeguard her rights? And the rights of other fifteen year old children who are raped and abused by the likes of him." The Court of Appeals did not find that this was addressing the defendant's future dangerousness because it did not specifically refer to the defendant, but rather to "the *likes* of him." *Id.* (Emphasis added).

In *State v. Baller*, 949 S.W.2d 269, 272 (Mo.App.1997), during closing argument, the prosecutor stated, "[t]here is no treatment for these types of people and the only thing you can do is lock them up for as long as you can." The Court of Appeals did not directly say that the State's argument was improper, however it held that "[e]ven if we assume the prosecutor's comment was improper, no plain error exists. Given other evidence against defendant that was presented at trial, it cannot be established that this comment had a decisive effect on the jury's determination." *Id.*

▮ In the present case, during closing argument, the State made the following statements:

And maybe recantation—you heard both experts, maybe recantation is part of the process. And why would it be part of the process? I mean, you go back and look from a seven-year-old's perspective of what happened to [Danny] after, after he told you, after he told about the abuse. I mean, you look at it from— just like you would if it were a child or your own and, and you were positive, positively or negatively reinforcing something, and he discloses the abuse.

And, and look at all the fun, wonderful things that happen[ed] to, to [Danny] as a consequence of that. He, he's concerned that he'll be exposed to the Griggs[ ] family. Well, I think that's fairly clear that that's going to be an ongoing problem in his life. He was, he was concerned that no one would believe him, He was concerned, in particular, that he'd be exposed again to the abuser.

* * *

He was concerned that he would be exposed again to the alleged abuser, Rory Griggs, which he was even while he was .incarcerated by the telephone, done by his—I won't say maniac dad, but done by his dad. Here, you want— anything you want to tell your uncle who's in jail because of what he, he did to you.

The defense objected that the State was arguing Griggs' future dangerousness to the jury. In overruling the objection, the trial court stated, "This is taken in a— made in a different context."

As in *Rich*, the trial court found, and we agree, that the State was addressing Danny's many recantations, not Griggs' future dangerousness. The victim's recantations were a weak link in the State's case; the State was entitled to address this weak link with the jury. This court will not lightly infer that the State intends an ambiguous remark to have its most damaging meaning, or that a jury, sitting through lengthy arguments, will draw a damaging meaning from among other, less damaging interpretations. *State v. Cannady*, 660 S.W.2d 33, 40 (Mo.App.1983). We believe the State was suggesting that Danny began recanting his story because (among other reasons) he was afraid of Griggs. We do not conclude that the State was

arguing that the jury should lock Griggs up because Danny was afraid of him.

We find no evidence that the trial court abused its discretion in failing to declare a mistrial based on the State's closing argument. Point III is denied.

Judgment of the trial court is affirmed.

ELLIS and HOWARD, JJ., concur.